1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ELLIOT GIPSON PC
ELLIOT B. GIPSON (State Bar No. 234020)
EGipson@elliotgipson.com
BRIANNA N. LOGAN (State Bar No. 347947)
BLogan@elliotgipson.com
15260 Ventura Blvd., Suite 835
Los Angeles, California 91403
Telephone: 310.817.1268

Attorneys for Defendant and
Counterclaim Plaintiff CBMG, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DIEGO BASILE, professionally known as ATLXS, an individual,

        Plaintiff

        v.

CBMG, LLC, doing business as BROKE, a Delaware limited liability company, DOES 1-10 inclusive,

        Defendant.

CBMG, LLC, a Delaware limited liability company,

        Counterclaim Plaintiff

        v.

DIEGO BASILE, professionally known as ATLXS, an individual,

        Counterclaim Defendant.

CASE NO. 2:25-CV-10051-MCS-RAO

**DEFENDANT CBMG, LLC'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEFENDANT'S COUNTERCLAIM COMPLAINT**

Judge:      Hon. Mark C. Scarsi
Courtroom:  7C, 7th Floor

Action filed:  October 20, 2025
FAC filed:    November 25, 2025
Trial date:    TBD

ELLIOT GIPSON PC

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

## ANSWER

Defendant and Counterclaim Plaintiff CBMG, LLC (the "Defendant") answer Plaintiff's First Amended Complaint (the "Complaint") on information and belief as follows:

### NATURE OF THE ACTION

1.    Defendant admits that Plaintiff has asserted claims of copyright infringement against it. Except as admitted, Defendant denies Paragraph 1.

### PLAINTIFF

2.    Defendant admits that Plaintiff is an individual from Italy. Defendant has no personal knowledge as to the current residence of Plaintiff and therefore denies the remainder of Paragraph 2 of the Complaint on this basis.

### DEFENDANT

3.    Defendant admits Paragraph 3.

### JURISDICTION AND VENUE

4.    Defendant admits that this Court has subject matter jurisdiction over this matter as pleaded.

5.    Defendant admits that this Court has personal jurisdiction over Defendant as pleaded. Defendant denies that it has caused injury to Plaintiff.

6.    Defendant admits that venue is proper in this district.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.    Defendant admits Paragraph 7.

8.    Defendant admits Paragraph 8.

9.    Defendant admits Paragraph 9.

10.   Defendant admits Paragraph 10.

11.   Defendant admits that Plaintiff entered into a recording and distribution agreement with Defendant. Except as admitted, Defendant denies Paragraph 11.

12.   Defendant admits Paragraph 12.

13.   Defendant denies Paragraph 13.

1

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

14.    Defendant admits Paragraph 14.

15.    Defendant denies Paragraph 15.

16.    Defendant admits Paragraph 16.

17.    Defendant admits that Plaintiff's counsel wrote a letter purporting to disaffirm the Recording Agreement. Except as admitted, Defendant denies Paragraph 17.

18.    Defendant admits Paragraph 18.

19.    Defendant admits Family Code Section 6710 states the circumstances in which a minor may void a contract. Except as admitted, Defendant denies Paragraph 19.

20.    Defendant denies Paragraph 20.

21.    Defendant admits Paragraph 21.

22.    Defendant denies Paragraph 22.

23.    Defendant denies Paragraph 23.

## FIRST CAUSE OF ACTION

## DECLARATORY RELIEF AND JUDGEMENT

24.    Paragraph 24 of the Complaint does not require an admission or denial. To the extent that it does, Defendant denies Paragraph 24.

25.    Defendant admits Paragraph 25.

26.    Defendant denies Paragraph 26.

27.    Defendant denies Paragraph 27.

28.    Defendant admits Paragraph 28.

29.    Defendant admits Paragraph 29.

30.    Defendant admits Paragraph 30.

## SECOND CAUSE OF ACTION

## DIRECT COPYRIGHT INFRINGEMENT

31.    Paragraph 31 of the Complaint does not require an admission or denial. To the extent that it does, Defendants deny Paragraph 31.

32.    Defendant denies Paragraph 32.

33.    Defendant admits Paragraph 33.

ELLIOT GIPSON PC

2

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

34.    Defendant denies Paragraph 34.

35.    Defendant denies Paragraph 35.

36.    Defendant denies Paragraph 36.

37.    Defendant denies Paragraph 37.

38.    Defendant denies Paragraph 38.

## THIRD CAUSE OF ACTION

### CONTRIBUTORY COPYRIGHT INFRINGEMENT

39.    Paragraph 39 of the Complaint does not require an admission or denial. To the extent that it does, Defendant denies Paragraph 39.

40.    Defendant denies Paragraph 40.

41.    Defendant denies Paragraph 41.

42.    Defendant denies Paragraph 42.

43.    Defendant denies Paragraph 43.

44.    Defendant denies Paragraph 44.

## FOURTH CAUSE OF ACTION

### VICARIOUS COPYRIGHT INFRINGEMENT

45.    Paragraph 45 of the Complaint does not require an admission or denial. To the extent that it does, Defendant denies Paragraph 45.

46.    Defendant denies Paragraph 46.

47.    Defendant denies Paragraph 47.

48.    Defendant denies Paragraph 48.

49.    Defendant denies Paragraph 49.

50.    Defendant denies Paragraph 50.

## FIFTH CAUSE OF ACTION

### RECISSION

51.    Paragraph 51 of the Complaint does not require an admission or denial. To the extent that it does, Defendant denies Paragraph 51.

52.    Defendant admits that Plaintiff sent Defendant a letter through Defendant's

3

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

counsel purporting to disaffirm the Recording Agreement. Except as admitted, Defendant denies Paragraph 52.

53.    Defendant denies Paragraph 53.

54.    Defendant denies Paragraph 54.

55.    Defendant denies Paragraph 55.

56.    Defendant denies Paragraph 56.

## AFFIRMATIVE DEFENSES

As separate and additional defenses, upon information and belief, Defendant alleges as follows:

### FIRST AFFIRMATIVE DEFENSE

(Failure to State a Claim)

The Complaint fails to allege facts sufficient to state a claim for relief.

### SECOND AFFIRMATIVE DEFENSE

(Lack of Standing)

Plaintiff's claims are barred because Plaintiff lacks standing to assert the claims in the Complaint.

### THIRD AFFIRMATIVE DEFENSE

(Laches)

Plaintiff is barred by the equitable doctrine of laches from asserting any of the claims for relief alleged in the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

(Unclean Hands)

Plaintiff is barred by the equitable doctrine of unclean hands from asserting any of the claims for relief alleged in the Complaint.

//

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

**FIFTH AFFIRMATIVE DEFENSE**

(Estoppel)

Plaintiff's claims are barred by the equitable doctrine of estoppel from asserting any claims for relief alleged in the Complaint.

**SIXTH AFFIRMATIVE DEFENSE**

(Waiver)

Plaintiff's claims are barred by the equitable doctrine of waiver from asserting any of the claims for relief alleged in the Complaint.

**SEVENTH AFFIRMATIVE DEFENSE**

(Justification)

All actions by Defendant of which Plaintiff complains in the Complaint were justified and Defendant has at all times acted in good faith.

**EIGHTH AFFIRMATIVE DEFENSE**

(No Injury)

Plaintiff is barred from obtaining any relief from Defendant because Plaintiff has suffered no injury or damage as a result of any act or conduct by Defendant.

**NINTH AFFIRMATIVE DEFENSE**

(Acquiescence)

Plaintiff's claims are barred because of the doctrine of acquiescence.

**TENTH AFFIRMATIVE DEFENSE**

(Nonjoinder of Parties)

Plaintiff failed to join all indispensable parties. As a result of this failure to join, complete relief cannot be accorded to those already parties to the action and will result in prejudice to the parties in any possible future litigation.

**ELEVENTH AFFIRMATIVE DEFENSE**

(No Infringement)

Plaintiff's claims are barred, in whole or in part, because Defendant did not infringe the assets alleged in the Complaint.

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

ELLIOT GIPSON PC

## TWELFTH AFFIRMATIVE DEFENSE

### (No Causation)

Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, were not caused by Defendant.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Copyright or License)

Plaintiff's claims are barred, in whole or in part, because Defendant has a valid copyright or license for the alleged assets at issue.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Offset)

Any of Plaintiff's alleged sums owed should be offset against monies owed by the Plaintiff to Defendant.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (No Damages)

Plaintiff's causes of action are barred because Plaintiff has not suffered any actual compensable damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

Plaintiff would receive more money than he is entitled to if he should prevail on his claims against Defendant.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Innocent Infringement)

In the event that the Court finds infringement, Plaintiff's damages are limited as Defendant had no reason to believe that its acts constituted an infringement of copyright. 17 U.S.C. § 504(c)(2).

//

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Reservation)

As to the entire Complaint, Defendant presently has insufficient knowledge or information on which to form a belief as to whether they have any additional, as yet unstated, defenses to the Complaint. Defendant reserve its rights to assert additional defenses if appropriate.

## CBMG, LLC'S COUNTERCLAIMS

Defendant and Counterclaim Plaintiff CBMG, LLC (hereinafter "CBMG" or "Defendant"), by and through counsel hereby alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      Plaintiff Diego Basile (hereinafter, "Plaintiff" or "Mr. Basile") is a musician. Defendant CBMG is a record label. CBMG's counterclaims are about the assignment agreements that Mr. Basile executed, benefited from, ratified and affirmed.

2.      Mr. Basile wrote and recorded a song called PASSO BEM SOLTO (the "Original") some time in or around April of 2024. At the time, Mr. Basile was the sole author and owned 100% of the composition to the song and 100% of the master recording to the song.  He created four (4) additional versions of the song and recording referred to as follows:  PASSO BEM SOLTO – Sped Up, PASSO BEM SOLTO – Slowed, PASSO BEM SOLTO – Super Sped Up, and PASSO BEM SOLTO – Super Slowed (together, with the Original, the "Tracks").

3.      Mr. Basile released the Tracks in 2024.  After several months, it was clear the Tracks had not caught on. By his own admission, the Tracks were only averaging 2,000 to 3,000 streams per day. Given his disappointment with the performance of the Tracks to date, Mr. Basile was open to third parties distributing the Tracks.

4.      CBMG thought that given the right marketing and strategy, it could "break" the Tracks and make the Original a hit. On or around January 2025, CBMG reached out

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

to Mr. Basile to inquire about a potential assignment agreement in which CBMG would administer and distribute the Tracks.

5.    After discussions, Mr. Basile and his mother signed a letter agreement with CBMG on or about January 24, 2025 which assigned to CBMG the exclusive right to administer the masters of Tracks for the term of the Copyright (the "First Assignment"). Under the terms of the First Assignment, Mr. Basile still owned the copyright to the masters for the Tracks.  The First Assignment also granted CBMG a 50% interest in the copyright to the composition of the Tracks, and a fifty-fifty split of the defined Net Profits.  A true and correct copy of the First Assignment is attached as **Exhibit A**.

6.    The First Assignment is not an employment agreement or otherwise a contract for Mr. Basile's personal services.  It does not require Mr. Basile to perform any personal services for CBMG. Rather, its essence is an assignment of intellectual property rights and the administration of such rights.

7.    Soon after signing and delivering the Tracks, CBMG went to work to make the Tracks a success. CBMG succeeded.  The Tracks' streaming success began to grow exponentially, going from a few thousand streams a day prior to CBMG's involvement to soon reaching millions of streams per day.

8.    On or around March 2025, CBMG and Mr. Basile began to discuss collaborating on releasing more of Mr. Basile's music in light of the success CBMG had in distributing the Tracks.

9.    After a couple months of discussions,  Mr. Basile signed a second agreement with CBMG on May 23, 2025, after his eighteenth birthday (the "Second Assignment").

10.    The Second Assignment was for the administration and distribution of three additional masters (the "New Tracks").  The Second Assignment had similar terms to the First Assignment.

11.    The Second Assignment is not an employment agreement or otherwise a contract for Mr. Basile's personal services. Rather, its essence is an assignment of intellectual property rights and the administration of such rights.

12. In addition, the Second Assignment specifically amended the First Assignment to the benefit of Mr. Basile.

13. Section 11 provides:

**Matching Rights Clause - Release (Custom):**

Notwithstanding any other provision in this Agreement, the Matching Right Clause detailed in the exclusive license agreement for "Mr. Basile - PASSO BEM SOLTO" dated on Jan 24th, 2025 shall be waived and shall cease to have effect upon the completion of the Recording Commitment as defined in the specific section or clause detailing the Recording Commitment. Upon the fulfillment of the Recording Commitment, all recordings released by Artist after the Effective Date of this license and waiver will not be subject to the prior Matching Right Clause. The Label acknowledges and agrees that, following the completion of the Recording Commitment, the Artist is free to negotiate and enter into any Further Agreements regarding such recordings without offering the Label the right of first negotiation or any matching rights as previously stipulated. This waiver is irrevocable and acknowledges the completion of all obligations under the Recording Commitment by the Artist as sufficient condition for its activation.

14. This sophisticated amendment to the First Assignment was a significant concession by CBMG as it meant that Mr. Basile was free to sign with other labels without CBMG having a right to match the offers, after Mr. Basile delivered the New Tracks.

15. Nonetheless, the Second Assignment maintained Mr. Basile's exclusivity to CBMG from the "Effective Date" of the Second Assignment on May 23, 2025 through full delivery of the New Tracks. In other words, until such time as Mr. Basile delivered the New Tracks, he may not release music except through CBMG. A true and correct copy of the Second Assignment is attached as **Exhibit B**.

16. This Second Assignment included provisions for an advance, a performance bonus, and a marketing fund.

17.    It is uncontested that Mr. Basile was over the age of 18 when he signed the Second Assignment.

18.    CBMG invested significant resources into Plaintiff and Plaintiff's music, including approximately $100,000 on influencer campaigns, spending in excess of $25,000 to boost performance on TikTok, and securing prominent billboards in Times DSquare in New York and Hollywood Boulevard in Los Angeles. Prior to CBMG's distribution of the Tracks, they were effectively dead, garnering less than 10,000 streams per day on Spotify in January 2025. After signing with CBMG, the streams rocketed to average more than 3 million streams a day on Spotify.

19.    Mr. Basile has continuously encouraged and approved of CBMG's marketing and distribution efforts both before and after he turned 18, such approving CBMG's marketing of PASSO BEM SOLTO on a billboard in Times Square and the publication of YouTube shorts featuring the Tracks at CBMG's request so that YouTube could "boost" them.

20.    CBMG's efforts to push the Tracks paid off.  The Tracks have been streamed more than 100 million times on Spotify.  In fact, PASSO BEM SOLTO was recently certified a Gold single by RIAA in the United States on November 4, 2025, after Mr. Basile's initiation of the instant lawsuit.  In fact, Mr. Basile was so pleased with this rarified accomplishment that he reposted CBMG's social media post regarding it.

21.    CBMG brings this countersuit to seek remedies for the multiple ways in which Mr. Basile has taken advantage of CBMG by attempting to take the benefits of CBMG's hard work in breaking Mr. Basile as an artist without paying CBMG for it. CBMG seeks to hold Mr. Basile to account for his promises in the First Assignment and the Second Assignment.

22.    Mr. Basile re-affirmed and ratified the First Assignment with CBMG after reaching age of majority, both explicitly through amending his original agreement with CBMG by signing the Second Assignment after he was age 18 and by approving the marketing plans of his music throughout the release of the Tracks.

23.     Mr. Basile's sophisticated conduct in business matters is further exemplified by his tax planning and explicit directions to CBMG beginning on or around May 2025 to withhold the payment of royalties to Mr. Basile so that Mr. Basile could minimize their tax impacts upon himself.  The holding of payments was important to Mr. Basile, and he continued to contact CBMG to make sure CBMG was holding the payments and not sending them out to him through July and August of 2025.  In other words, he wanted to time the payments he received under the First Assignment in order to minimize the taxes he owed.  Far from being a naïve child, Mr. Basile's tax planning is indicative of an adult fully aware of the business consequences of his choices and his conduct ratifies the First Assignment subsequent to his 18th birthday.

24.     Moreover, Mr. Basile has been in breach of his exclusivity obligations of the Second Assignment by releasing the following tracks outside of CBMG:

- *Montagem Ladrao* with more than 150 million streams on Spotify;
- *Montagem Tocando* with more than 2 million streams on Spotify;
- *Festa Tropical (Feature)* with more than 2 million streams on Spotify;
- *Montagem Bailao (Feature)* with more than 150 million streams on Spotify;
- *Montagem Verao (Feature)* with more than 5 million streams on Spotify;
- *Montagem Vida* with more than 2.5 million streams on Spotify;
- *Montagem Ritmica* with more than 2.5 million streams on Spotify; and
- *Sin Drama* with  more than 2 million streams on Spotify

25.     Since he turned 18, Mr. Basile acknowledged the release of these tracks breached his contractual commitments to CBMG.

26.     Mr. Basile has already written and created the compositions and masters for the New Tracks.  Indeed, any three (3) of the tracks he released in violation of the Second Assignment could have been delivered as the New Tracks.  However, Mr. Basile brazenly breached the Second Assignment he signed with CBMG by flatly refusing to deliver the New Tracks he was contractually obligated to provide to CBMG by November 23, 2025.

27.     CBMG has been damaged by Mr. Basile's actions.

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

ELLIOT GIPSON PC

## JURISDICTION AND VENUE

28.    This Court has original subject matter jurisdiction over CBMG's declaratory relief claims regarding its ownership of the copyright registrations at issue pursuant to 28 U.S.C. §§ 1331 and 1338(a).

29.    In addition, this Court has supplemental jurisdiction over CBMG's state law claims pursuant to 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Plaintiff because Plaintiff has committed a substantial part of the wrongful acts alleged in the Counterclaim Complaint within this district. Further, Plaintiff has elected to file this lawsuit in this district, thereby waiving any jurisdictional arguments.

31.    Venue is proper in this district under 28 U.S.C. § 1391 (b)-(c) and 28 U.S.C. § 1400(a) because a substantial part of the acts, events, and omissions complained of herein occur, or have occurred, in this district.

## THE PARTIES

32.    Defendant and Counterclaim Plaintiff CBMG, LLC is a record label. CBMG is a Delaware company with its principal place of business in Los Angeles, California.

33.    Plaintiff and Counterclaim Defendant Diego Basile is an artist residing in Italy.

## FIRST CAUSE OF ACTION

### (Declaratory Relief and Judgement)

34.    CBMG repeats and realleges paragraphs number 1 through 33 as if fully set forth herein.

35.    CBMG alleges that an actual case or controversy has arisen by the filing of this lawsuit and now exists concerning the ownership of the copyrights at issue and enforceability of the contracts at issue against Mr. Basile.

36.    CBMG has provided notice to Mr. Basile through his attorneys that CBMG believes Mr. Basile' contracts remain in full force and effect and that CBMG is the

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

rightful owner of the copyrights at issue. Mr. Basile executed the First Assignment on or about January 24, 2025. Mr. Basile executed the Second Assignment on or about May 23, 2025.

37.    Through his attorneys, Mr. Basile has provided notice to CBMG that Mr. Basile believes the Assignments at issue are void and that Mr. Basile is the sole and rightful owner of the copyrights to the Tracks and has the authority to exclusively administer the rights to the compositions and masters of the Tracks.

38.    CBMG seeks a declaration that the First Assignment is valid and not void, that the Second Assignment is valid and not void, that CBMG owns the exclusive rights to administer the master recordings of the Tracks for the term of copyright, that CBMG owns the exclusive right to administer the publishing rights of the Tracks for the term of copyright, and that CBMG is a 50% copyright of owner of the compositions for the Tracks.

## SECOND CAUSE OF ACTION

### (Repudiation/Anticipatory Breach of Contract)

39.    CBMG repeats and realleges paragraphs number 1 through 38 as if fully set forth herein.

40.    CBMG and Mr. Basile have entered into a written agreement. The First Assignment was later modified by the Second Assignment.  A true and correct copy of the First Assignment and the Second Assignment are attached hereto as Exhibits A and B.

41.    Mr. Basile expressly repudiated the First Assignment in his correspondence with CBMG through his attorneys.  In sum, Mr. Basile indicated an intent to not be bound by the First Agreement's provisions regarding CBMG's exclusive administration of the masters and compositions regarding Tracks. Despite this repudiation, to CBMG's knowledge, Mr. Basile has not yet attempted to distribute the Tracks through any third party.

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

42.     However, Mr. Basile's explicit statements attempting to void the First Assignment are a repudiation and are effectively a breach of contract. CBMG is not required to stand idly by and wait for Mr. Basile to take the next step and explicitly distribute the Tracks through a third party.

43.     CBMG has effectively been damaged by Mr. Basile's stated intent to breach the First Assignment.

44.     CBMG has performed all of its obligations under the First Assignment and Second Assignment. CBMG is ready, willing and able to exclusively administer the Tracks as it has continuously since the inception of the First Assignment.

45.     The Tracks are special and unique.  CBMG's continued success as a record label derives in large part from its reputation for its ability to recognize potential hits and "break" artists. CBMG derives unique value from distributing such Tracks apart from the pecuniary value of the Tracks and cannot be adequately compensated for Mr. Basile's repudiation with  damages. Therefore, CBMG seeks injunctive relief to prevent Mr. Basile from distributing the Tracks with any third party.

46.     In the alternative, CBMG seeks damages in an amount to be determined at trial but no less than $1,000,000.00.

## THIRD CAUSE OF ACTION

### (Breach of a Written Contract)

47.      CBMG repeats and realleges paragraphs number 1 through 46 as if fully set forth herein.

48.     CBMG and Mr. Basile have entered into a written agreement in the form of the First Assignment and Second Assignment. The First Assignment was later modified by the Second Assignment, which was signed after Mr. Basile was 18. A true and correct copy of the First Assignment and the Second Assignment are attached to this Counterclaim as Exhibits A and B.

49.    Mr. Basile has breached his obligations under the Second Assignment by failing to deliver the New Tracks and by distributing other music through third parties prior to delivering the New Tracks.

50.    CBMG has been damaged by Mr. Basile's breaches.

51.    CBMG has performed all of its obligations under the Second Assignment. CBMG is ready, willing and able to exclusively administer the New Tracks.

52.    The New Tracks are special and unique. CBMG's continued success as a record label derives in large part from its reputation for its ability to recognize potential hits and "break" artists. CBMG derives unique value from distributing music such as the New Tracks apart from the pecuniary value of the New Tracks and cannot be adequately compensated for Mr. Basile's breaches with damages. Therefore, CBMG seeks injunctive relief to prevent Mr. Basile from distributing any music with any third party prior to his delivery of the New Tracks to CBMG pursuant to the terms of the Second Assignment.

53.    In the alternative, CBMG seeks damages in an amount to be determined at trial but no less than $1,000,000.00.

## FOURTH CAUSE OF ACTION

### (Breach of Good Faith and Fair Dealing)

54.    CBMG repeats and realleges paragraphs number 1 through 53 as if fully set forth herein.

55.    In the alternative to the above alleged breach of contract claims, CBMG hereby alleges a breach of the implied duty of good faith and fair dealing.

56.    CBMG and Mr. Basile entered into the contracts in the form of the First Assignment and Second Assignment.

57.    CBMG did all, or substantially all, of the significant things the contracts required CBMG to do, or CBMG was excused from having to do those things. With respect to the First Assignment, CBMG has continuously marketed and distributed the Tracks since the effective date of the agreement and was continuously encouraged to do

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

so by Mr. Basile's conduct up until the point where Mr. Basile first attempted to void his contracts on or about September 2025.

58.    All of the conditions for Mr. Basile's performance in the contracts have occurred or were excused.

59.    Mr. Basile has prevented CBMG from receiving the benefits of the First Assignment and Second Assignment by attempting to void the contracts, by threatening to distribute the Tracks elsewhere, by refusing to deliver the New Tracks, and by distributing music via third parties prior to delivering the New Tracks to CBMG.

60.    By taking these actions, Mr. Basile has failed to act fairly and in good faith.

61.    CBMG was harmed by Mr. Basile's actions in an amount to be determined at trial but no less than $1,000,000.00.

## **FIFTH CAUSE OF ACTION**

### **(Common Count/Quantum Meruit)**

62.    CBMG repeats and realleges paragraphs number 1 through 61 as if fully set forth herein.

63.    In the alternative to the breach of contract and breach of duty of good faith and fair dealing claims, CBMG hereby alleges a cause of action for common count/quantum meruit.

64.    Mr. Basile requested, by words or conduct, that CBMG perform music administration and distribution services for the benefit of Mr. Basile in connection with the Tracks.

65.    CBMG performed the services as requested.

66.    Mr. Basile has indicated through communications and the filing of his Complaint an intent not to pay for such services. Mr. Basile's failure to pay CBMG the value of its services amounts to unjust enrichment. CBMG is damaged by Mr. Basile's actions.

67.    The reasonable value of the music administration and distribution services provided are to be proven in a trial but are no less than fifty percent (50%) of the revenue

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

ELLIOT GIPSON PC

of the collected revenue in connection with the Tracks after costs and fees of been deducted.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counterclaim Plaintiff prays for judgment as follows:

1. That the Court deny Plaintiff's declaratory relief in its entirety;

2. That Plaintiff takes nothing on its claims against Defendant;

3. That the Court deny Plaintiff's injunctive relief in its entirety;

4. That Plaintiff's First Amended Complaint be dismissed in its entirety with prejudice;

5. For declaratory relief that:

    a.    CBMG owns the exclusive rights to administer the composition and masters for the Tracks;

    b.    CBMG owns fifty percent (50%) of the composition for the Tracks;

    c.    The First Assignment is not void and remains in full force and effect;

    d.    The Second Assignment is not void and remains in full force and effect;

6. For negative injunctive relief that:

    a.    Orders Mr. Basile not to attempt to distribute the Tracks or administer the rights to the Tracks;

    b.    Orders Mr. Basile not to attempt to distribute any music prior to Mr. Basile's delivery of the New Tracks pursuant to the Second Assignment;

7. In the alternative, for general, compensatory, expectation and consequential damages in an amount to be determined at trial but no less than $1 million dollars for Mr. Basile's breach of the First Assignment;

8. In the alternative, for general, compensatory, expectation and consequential damages in an amount to be determined at trial but no less than $1 million dollars for Mr. Basile's breach of the Second Assignment;

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

9.    In the alternative to the breach of contract claims and remedies, for restitution to CBMG in an amount to be determined at trial;

10.    In the alternative to the breach of contract claims and remedies, for punitive damages in an amount to be determined at trial;

11.    For any money damages awarded, for pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Mr. Basile;

12.    For all the costs of suit and attorneys' fees incurred by Defendant herein as the prevailing party, and by all other available law, contract, statute, caselaw, and/or equity; and

13.    For such other and further relief as the Court may deem just and proper.

DATED:  January 5, 2026

ELLIOT GIPSON PC
ELLIOT B. GIPSON
BRIANNA LOGAN


By____/s/ *Elliot B. Gipson*_____
    ELLIOT B. GIPSON
Attorneys for Defendant and Counterclaim
Plaintiff CBMG, LLC


## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, CBMG hereby demands a trial by jury of all issues in the Complaint and Counterclaim Complaint that are subject to jury trial, if any.

DATED:  January 5, 2026

ELLIOT GIPSON PC
ELLIOT B. GIPSON
BRIANNA LOGAN


By_____/s/ *Elliot B. Gipson*_____
ELLIOT B. GIPSON
Attorneys for Defendant and Counterclaim
Plaintiff CBMG, LLC

ELLIOT GIPSON PC

CBMG'S ANSWER AND COUNTERCLAIM COMPLAINT

# Exhibit A

CBMG LLC d/b/a "Broke"
1320 N Wilton Pl. Los Angeles, CA 90028

Date: January 24, 2025 ("Effective Date")

Diego Basile (p/k/a) "ATLXS"
("Artist", "you" or words of similar connotation)
c/o Via Campetto dei Macellari N114; Velletri, Lazio, Italy,00049

Cornelia Closca
("Guardian" or words of similar connotation)
c/o Via Campetto dei Macellari N114; Velletri, Lazio, Italy,00049

This letter agreement sets forth the material terms of the exclusive agreement between you and CBMG LLC d/b/a "Broke" ("Broke", "we", "us" or "Label"), pursuant to which we engage your services throughout the Territory for the purpose of making records, and you agree to render such services to us. The parties intend to enter into a more formal agreement with respect to the subject matter hereof at a later date ("Long Form"). However, until such time as a Long Form is completed, this agreement, including, without limitation, all promises and covenants contained in Exhibit A, attached hereto and incorporated herein by this reference, governs the relationship between the parties hereto with respect to the subject matter hereof and is binding.

1.      **Territory**: Worldwide

2.      **Recording Commitment**: You shall deliver to us five (5) existing master recordings titled listed on Schedule ("Existing Master(s)") within thirty (30) days of the Effective Date.

Throughout this period and until the final Master required under this Agreement is delivered and accepted by us, you agree to release music exclusively through the Label. For purposes of this Agreement, "Delivery" shall mean the actual receipt (and acceptance/approval) by us and our distributor of fully mixed and edited Master(s) embodying material approved by us that are commercially and technically satisfactory to us (in our sole discretion) for the manufacture and sale of records, together with all applicable mixes, edits, artwork, materials, consents, approvals, clearances, licenses, permissions, side artist, sample and producer agreements, and any other materials reasonably requested by us.

3.      **Advance**: We hereby agree to pay you an advance of One Thousand Dollars ($1,000) (the "Advance"), which shall be fully recoupable against your share of Net Profits; the Advance shall be paid thirty (30) days upon your delivery to us and our acceptance of the Recording Commitment. The Advance shall be inclusive of all recording costs associated with the Master(s) delivered hereunder, and except as set forth herein, you will be solely responsible for the payment of all recording costs and related costs incurred to deliver each record and other materials hereunder.

4.      **Marketing Fund**: We shall provide to you an all-in marketing fund of up to Five Thousand Dollars ($5,000) to be administered by us, which shall be inclusive of all marketing, promotion, and advertising (each a "Marketing Fund") for the Recording Commitment. The Marketing Fund shall be fully recoupable against your share of Net Profits.

5.      **Royalties**:  We will pay you Fifty Percent (50%) of our Net Profits (as hereinafter defined) in connection with the Master(s)("Royalty"). As used herein, "Net Profits" shall mean the gross fees, royalties and all other consideration actually received by us which are solely, directly and identifiably attributable to the exploitation of the Master(s) and/or Composition(s) ("Gross Income") less the following: (i) the deduction of any distribution expenses (including, without limitation, fees charged by any distributor and/or retail Platform, credit card fees, costs associated with the ingesting of files or correction of any information related thereto), (ii) reasonable reserves for returns, refunds, rebates, credits and exchanges, and (iii) any sales, use, value added or other taxes. For the avoidance of doubt, any other third party costs or expenses incurred and paid by us in connection with the production, marketing, promotion or other exploitation of the Master(s), all records derived therefrom, and the Composition(s) shall be fully recoupable as an advance against your share of Net Profits, including, without limitation: (1) manufacturing costs, (2) any costs incurred and paid by us in connection with the recording of the Master(s) (including, without limitation, mixing/re-mixing/mastering costs, studio fees, costs of creating any remixes, fees paid to third-party producers, remixers, featured performers, or any other third-parties rendering services in connection with the Master(s), etc.), (3) all third party expenses relating to manufacturing, exploiting or otherwise producing the Master(s) (including, without limitation, the Marketing Fund(s), and any applicable union or guild payments in respect of exploitations of the Master(s)), (4) all costs of collection, copyright registration, any taxes required to be deducted, any collection or other society charges, and any sums paid or owed to third party subpublishers, licensing agents, arrangers, adaptors or translators of the Compositions, and (5) co-op advertising costs or consumer advertising costs. Notwithstanding the foregoing, Net Profits shall expressly exclude (x) the "label share" of SoundExchange and/or neighboring rights income (which we will solely claim and keep for ourselves, but you can claim and keep for yourself the "performer's share" thereof), and (y) any income collected by us via the so-called YouTube Partner Program. For the avoidance of doubt, you share of Net Profits hereunder is inclusive of any and all mechanical royalties payable to you and/or any third parties.

6.      **Rights**: We (and our designee(s)) will have the sole and exclusive right to exploit the Master(s) (and any derivative versions, such as remixes) together with all artwork, all videos, and all other materials related thereto in any manner and all media throughout the Territory during the License Period, including, without limitation, streaming, downloads, sales of physical records, synchronization licenses, compilation licenses, and licensing of performance rights related to the master recording (e.g.,

neighboring rights) under any mark/indicia designated by us, and the right to sub-license all of the foregoing rights to third parties, but you will still own the Master(s). The only exception is that we (and our designee(s)) can grant perpetual, worldwide synchronization and compilation licenses (including our own compilations). We (and our designee(s)) can also grant the right to use the Master(s) and Composition(s) on a gratis basis via third-party mobile applications (including, without limitation, Twitch, TikTok, and other analogous platforms) for promotional purposes. You give us the right to use your name, likeness, and biography in connection with our exploitation of the Master(s) and/or Composition(s). We will give you an opportunity to approve these materials, but you must respond in five (5) days or you automatically give approval. As used herein, "License Period" shall mean the period commencing on the Effective Date and continuing for the life of copyright (including any and all renewals and extensions thereof). Label shall be entitled to maintain one, uncrossed account with respect to all costs, royalties, or other amounts under this Agreement or under any other agreement between Artist and Label or Label's affiliates.

7.      **Holdback**: The "Holdback Period" begins on the Effective Date and shall end fourteen (14) days after the initial commercial release date of the final Master hereunder.  During the Holdback Period, you will not release (or permit the release) of any previously unexploited recordings featuring Artist other than through Label other than recordings that include Artist's performances as a producer, mixer, background vocalist or session musician.

8.      **Streaming Threshold**: If the Master's audio-only streams on Spotify exceed Fifty Thousand (50,000) per day for seven (7) consecutive days (the "Streaming Threshold"), the Label, at its sole discretion, may provide an additional fund of up to Fifteen Thousand Dollars ($15,000) for marketing, promotion, and advertising of the Master(s) (the "Threshold Fund"). The Threshold Fund is fully recoupable against your share of Net Profits.

9.      **Promotional Efforts**: Artist acknowledges the importance of consistent and frequent social media promotion for a successful release campaign. Artist must make a minimum of five (5) so-called "feed" posts on all social media outlets (e.g., Facebook, Instagram, TikTok, etc.) ("Posts") to promote the announcement and release of each Master on Artist's official Instagram and TikTok account within a time period provided by Label.

10.     **Controlled Compositions**: You hereby grant us and our licensees an irrevocable license to: (i) manufacture, reproduce and distribute each composition embodied on a Master hereunder (each a "Composition" and collectively, the "Compositions") on records throughout the Territory; (ii) print and reproduce the title and/or lyrics of each Composition on record artwork and in audiovisual works; and (iii) reproduce, manufacture, distribute, perform and exploit the Compositions in audiovisual works (including music videos) and in advertisements for the Masters in any and all media now known or hereafter devised, in any manner (including publicly and for profit). In consideration of the foregoing license, we shall pay mechanical royalties on net sales of records in the United States at seventy five percent (75%) of the current minimum statutory rate (without regard to playing time), subject to the following caps: 10x the applicable rate for albums; 5x the applicable rate for EP's and 2x the applicable rate for singles.

11.     **Matching Rights:** For a period of six (6) months following the final delivery and release of the Master(s) hereunder, Artist may not negotiate or enter into any Further Agreement without first offering to Label, by written notice, the right to negotiate and/or enter into a Further Agreement. If Label notifies Artist that Label desires to negotiate and/or enter into such Further Agreement, Label and Artist will negotiate in good faith with respect to the material terms of such Further Agreement and Label and Artist will expeditiously prepare and execute all appropriate documentation in connection with the Further Agreement. If Label and Artist do not reach an agreement as to the material terms of such a Further Agreement within thirty (30) business days following Label's receipt of Artist's notice ("ROFN Negotiation Period"), and provided that Artist has negotiated in good faith, Artist will have the right to offer such Further Agreement to third parties, subject to the terms and conditions set forth herein. If, after the ROFN Negotiation Period above, an unrelated third party makes an offer to Artist to enter into a Further Agreement ("Third Party Offer"), Artist agrees that Artist will not accept such Third Party Offer without first offering to Label the opportunity to enter into a Further Agreement on substantially the same commercial terms as the Third Party Offer. Artist agrees to give Label written notice of any such acceptable Third Party Offer as described above (which notice must set forth the name of the applicable third party and include a copy of such Third-Party Offer), and Label will have sixty (60) business days after receipt of such notice in which to notify Artist whether or not it desires to enter into a Further Agreement based upon the terms of the Third Party Offer. Label will not be required, as a condition of accepting any such offer, to agree to any terms or conditions which cannot be fulfilled by Label as readily as by any other sound recording distributor. If Label notifies Artist of its acceptance of any such offer within sixty (60) business days after its receipt thereof, Label and Artist will negotiate in good faith and expeditiously prepare and execute all appropriate documentation in connection with the applicable Further Agreement. If Label fails to give Artist written notice within the foregoing sixty (60) business days period that it is exercising its option to enter into a Further Agreement based upon the Third Party Offer, Artist will have the right to accept the Third Party Offer, but only pursuant to terms that are no less favorable to Artist than those set forth in Artist's notice to Label, provided, if Artist does not accept such offer from such third party within thirty (30) days, Artist will not enter into a Further Agreement without again offering the opportunity to Label in the manner set forth hereinabove. For purposes hereof, "Further Agreement" means any and all distribution, administration, recording or similar agreements that Artist may decide to enter into after the Term.

12.     **Publishing**: You hereby irrevocably transfer, convey, grant and assign to us, our successors and assignees, an undivided fifty percent (50%) of your respective right, title and interest throughout the Territory, including, without limitation, the copyright, the right to secure copyright registration and any and all rights of renewals and extensions of copyright, in and to all Composition(s), including the title, lyrics and music thereto, and grant to us the exclusive rights to administer one hundred percent (100%) of the copyrights in and to the Composition(s). We shall retain all rights acquired by it under this agreement in the Territory for the maximum life of the copyright and any and all renewals and extensions thereof.

13.     **Accounting**: Monthly- within ninety (90) days after each monthly accounting period (i.e., within 90 days of June 30 and December 31) (the "Accounting Period(s)"). You can audit us (at your sole expense, on reasonable advance notice, no more than once per calendar year or statement, and during our regular business hours), to ensure you are being paid properly, but if you do not dispute a particular statement within two (2) years after we render it you, then you agree that it is binding and you cannot object to it. You cannot sue us regarding any statement unless you do so within three (3) years after the date it is rendered.

14.     **Samples**: You acknowledge and agree that you are solely responsible for accounting any amounts due in connection with any samples embodied in the Master(s) or Composition(s) (each, a "Sample") directly to the applicable third-party sample owner (each, a "Sample Owner") (including, without limitation, any portion of your share of Net Profits), and that you shall be solely responsible for all costs associated with clearing such sampled or interpolated third party material ("Clearance Costs'). Notwithstanding the foregoing, and solely as an accommodation to you, we shall have the right, but not the obligation, at our sole election, to pay the Clearance Costs for any Samples to the applicable Sample Owner, which Clearance Costs shall be deemed fully recoupable as advances against your share of Net Profits. If we elect to make any such payments to the Sample Owners (or any other third-party), such payments shall be made solely as an accommodation to you and are deemed to be payment to you. In no event will any Sample Owner be deemed a third party beneficiary under this Agreement or enjoy any rights against us.

*SIGNATURE PAGE FOLLOWS*

**AGREED AND ACCEPTED:**

Label / "Us"

*Andre Benz*

By: Authorized Signatory
DOX ID: P8-4Y2WWPKL

**AGREED AND ACCEPTED:**

Artist / "You"

*Diego Basile*

By: Authorized Signatory
DOX ID: 6Q-4Y2WWPKL

**AGREED AND ACCEPTED:**

Guardian

*Cornelia Closca*

By: Authorized Signatory
DOX ID: 9J-4Y2WWPKL

**Schedule**

| TITLE | MASTER OWNERSHIP | COMPOSITION OWNERSHIP | CREDITS |
|---|---|---|---|
| PASSO BEM SOLTO | Diego Basile – 100% | Diego Basile – 100% | ATLXS |
| PASSO BEM SOLTO – Sped Up | Diego Basile – 100% | Diego Basile – 100% | ATLXS |
| PASSO BEM SOLTO – Slowed | Diego Basile – 100% | Diego Basile – 100% | ATLXS |
| PASSO BEM SOLTO – Super Sped Up | Diego Basile – 100% | Diego Basile – 100% | ATLXS |
| PASSO BEM SOLTO – Super Slowed | Diego Basile – 100% | Diego Basile – 100% | ATLXS |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**EXHIBIT A**
**Terms and Conditions**

1. **Independent Contractor.** This Agreement shall not render Label an employee, partner, or joint venturer with Artist for any purpose. Label is and will remain an independent contractor in his or her relationship to Artist.

2. **Obligations, Representations and Warranties.** Each party represents and warrants that it: (i) is an entity duly formed and/or organized and validly subsisting pursuant to the laws of its jurisdiction of formation and/or organization; (ii) that this Agreement has been executed by a duly authorized representative; and (iii) that it has the right, power and authority to enter into this Agreement and to fully perform its respective obligations hereunder. Artist further represents and warrants that (i) no selections, materials, ideas, or other properties furnished by Artist or anyone engaged or furnished by Artist and embodied or contained in or used in connection with the Master(s) and/or Composition(s) will violate or infringe upon any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights, rights of privacy, proprietary or intellectual property rights, trademark rights, and rights of publicity or violate any applicable laws (including without limitation the laws and regulations governing export control, unfair competition, anti-discrimination or false advertising); (ii) all of Artist's representations and warranties contained in this Agreement shall be true and correct upon execution hereof and shall remain in effect for so long as Label, its licensees, assignees, transferees or successors in interest remain subject to this Agreement; (iii) any statements Artist makes regarding Label's products or services reflect Artist's true and honest opinion of, and experience with, Label's products and services. It is understood and agreed that Artist shall not, and shall not be required to, narrate or deliver any copy or statement that Artist believes is factually inaccurate; and (iv) Artist owns or controls, and shall own and control, the rights necessary to make the grants of rights, licenses and permissions hereunder and necessary for Label to effect the purpose of this Agreement, without the need for any licenses, releases, consents, approvals not granted herein or the requirement to make any payments of any nature to any person. Artist hereby agrees: (i) Artist shall be solely responsible for obtaining all necessary licenses, releases and permissions for any individuals, production, third party content, etc. and for making all payments in connection therewith and (ii) Artist will not re-record a master embodying a Composition during the License Period. In the event Artist consists of more than one individual and/or signatory the terms of this agreement (including the warranties and representations herein) shall be joint and several.

3. **Indemnification.** The Artist (for these purposes, "**Indemnitor**") shall indemnify, defend and hold the Label ("**Indemnitee**") harmless against and in respect of any claims, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and litigation costs), that Indemnitee may incur, which arise from or relate to any alleged breach of, or failure by Indemnitor to perform, any of Indemnitor's representations, warranties, or promises in this Agreement or in any schedule, certificate, exhibit, or other instrument furnished or to be furnished by Indemnitor under or in connection with this Agreement, except where such claims, losses, damages or expenses arise from the negligence or willful misconduct of the Label. It is understood that Indemnitor's obligation to indemnify and defend pursuant to this paragraph shall subsist regardless of whether Indemnitor defeats the claim or the claim results in an adverse judgment or settlement. Indemnitee shall notify Indemnitor of any claim presented to Indemnitee by a third party. Indemnitor shall defend any third-party claim, at its sole expense, with counsel approved by Indemnitee. However, if Indemnitee determines in its sole discretion that it is necessary for its own protection to take over the defense of any such claim, Indemnitee may do so at Indemnitor's sole expense and without any requirement to consult with Indemnitor about choice of counsel or the conduct of the proceeding. No such claim asserted by a third party may be settled by Indemnitee without Indemnitor's prior written consent (such consent not to be unreasonably withheld or delayed), so long as Indemnitee is actively defending such claim in a manner consistent with industry norms, unless Indemnitee shall agree not to seek indemnity from Indemnitor for any settlement payment made by Indemnitee to the claimant and further subject to the following. If Indemnitor does not approve a settlement proposed by Indemnitee, Indemnitee may nonetheless settle the matter unless, within ten (10) business days after notice to Indemnitor, Indemnitor furnishes to Indemnitee a surety bond or letter of credit from a national surety company or bank, in form and content satisfactory to Indemnitee, insuring Indemnitee against the amount of the claim in addition to reasonable attorney's fees and litigation costs expended in connection with the claim and a reasonable estimate of such fees and costs required to continue the defense. If any claim shall be lodged with Label or any action commenced having as its basis a claim which, if proved, would constitute a breach by Artist of any of Artist's representations, warranties, or covenants contained herein, Label, in addition to any other right or remedy otherwise available, shall have the right to control the defense thereof and settle same (subject to the above) and, additionally, may withhold from any payments otherwise due to Artist hereunder an amount equivalent to that claimed or sued for plus reasonable costs and attorney's fees relating thereto. Any amount so withheld shall be credited to Artist's account when Artist shall have received reasonable assurances that the claim or action has been finally settled or fully adjudicated and the judgment satisfied, or that the statute of limitations on such claim has run, or when reasonable and adequate security for the claim has been provided to Label.

4. **Limitation of Liability.** To the maximum extent permitted by applicable law, in no event will Label be liable to Artist for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct loss), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage or expense of any kind arising out of or in any way related to the Master(s), Composition(s), or this Agreement, even if foreseeable or even if Label has been advised or should have known of the possibility of such damages. Label assumes no responsibility for the downtime of Label's computers, Artist's network, or for the loss of information, data records, or the Master(s)/Composition(s) due to circumstances beyond Label's reasonable control, including but not limited to natural disasters, power outages, or third-party actions. In no event will Label's total liability to Artist for all damages, losses or causes of action exceed the total amount paid to Artist under this Agreement.

5. **Notices.** All notices hereunder shall be in writing and shall be sent by registered mail or certified mail, return receipt requested, postage prepaid and with receipt acknowledged, or by hand (to an officer if the party to be served is a corporation); or by telegraph, facsimile

or e-mail, all charges prepaid, at the respective addresses set forth above, or such other address or addresses as may, from time to time, be designated in writing by either party; provided, that payments may be made by means of regular mail. The date of making of personal service or of mailing or of deposit in a telegraph office or transmission via facsimile, or transmission via e-mail, whichever shall be first, shall be deemed the date of service, except that notice of change of address shall be effective only from the date of its receipt. If either party feels the other is in breach of this Agreement, each party has to give the other party written notice via personal delivery, certified or registered mail, or FedEx. Except in the case of a material breach by the Artist, the other party has thirty (30) days to cure any breach. In the event of a material breach by either party, the non-breaching party may terminate this Agreement immediately upon written notice to the breaching party.

6. **Confidentiality.** Artist shall hold in strict confidence all Proprietary Information (defined below) and take the same precautions as Artist employs to safeguard its own confidential information, but in no event shall Artist exercise less than a reasonable degree of care. Artist shall not use, disclose or reveal any Proprietary Information (or any information derived therefrom) to any person or entity, except on a "need to know" basis or for any purpose, except for Artist's use as necessary in the ordinary course of performing the Services. For purposes of this Agreement, "**Proprietary Information**" means all information, knowledge and data that relates to the actual or anticipated business, research, development, products, services and/or finances of Label, its affiliates or subsidiaries disclosed by, or obtained from, Label, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or visually, including, without limitation, algorithms, trade secrets, computer software, source code, data structures, databases, scripts, application programming interfaces, protocols, drawings, designs, mask works, formulas, technology, ideas, know-how, products, features and modes of operation, services, customer lists and customers, supplier lists and suppliers, compilations containing customer or supplier information, contacts at or knowledge of clients or prospective clients, finances, processes, schematics, specifications, techniques, inventions and improvements (whether or not patentable), patent applications, developments, discoveries, works of authorship, derivative works, technical, business, financial, marketing, customer and product related plans, analyses, compilations, studies, forecasts and strategies and confidential information received by Label from third parties and all information that is developed, created or discovered by Artist, either individually or in collaboration with others, in performing the Services.

7. **Entire Agreement and Severability.** This Agreement sets forth the entire agreement and understanding between Artist and Label relating to the subject matter herein and supersedes all prior discussions between Artist and Label. Any subsequent change or changes in Label's services will not affect the validity or scope of this Agreement. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

8. **Governing Law and Consent to Personal Jurisdiction.** This Agreement shall be governed by the laws of the State of California, without regard to California's conflicts of law rules. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the Commercial Rules of the American Arbitration Association (AAA) by a single arbitrator using expedited procedures and located in Los Angeles, California. The parties shall mutually agree upon the arbitrator and if the parties cannot agree then one shall be appointed according the AAA rules. Judgment upon the award rendered by the arbitrator may be entered into in any court of competent jurisdiction and shall not be appealable. Furthermore, the prevailing party shall be entitled to reasonable attorneys' fees. This clause shall not preclude any party from pursuing injunctive or equitable relief in any court of competent jurisdiction.

9. **Legal Representation.** Artist acknowledges and agrees that Artist has read this Agreement and that the Label has advised Artist of the importance of seeking independent legal advice. Artist acknowledges and agrees that Artist has had the unrestricted opportunity to be represented by an independent attorney. In the event of Artist's failure to obtain an independent attorney or waiver thereof, Artist hereby warrants, represents and agrees that Artist will not attempt to use such failure and/or waiver as a basis to avoid any obligations under this Agreement, or to invalidate this Agreement or to render this Agreement or any part thereof unenforceable.

10. **Assignment.** Artist does not have the right to assign or delegate any of Artist's rights or obligations of this Agreement to any third party (and any unauthorized assignment will be void ab initio), except that Artist can assign the right to receive payments to a furnishing company.

11. **Modification.** This Agreement may not be modified except by amendment reduced to writing and signed by both Artist and Label. No waiver of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach thereof.

12. **Headings.** Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

13. **Further Document.** If any other provisions or agreements are necessary to enforce the intent of this Agreement, each of Artist and Label agree to execute such provisions or agreements upon request.

14. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement. Electronic signatures and signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.

# Exhibit B

CBMG LLC d/b/a "Broke"
1320 N Wilton Pl. Los Angeles, CA 90028

Date: May 23rd, 2025 ("Effective Date")

Diego Basile (p/k/a) "ATLXS"
("Artist", "you" or words of similar connotation)
c/o Via Campetto dei Macellari N114; Velletri, Lazio, Italy,00049

This letter agreement sets forth the material terms of the exclusive agreement between you and CBMG LLC d/b/a "Broke" ("Broke", "we", "us" or "Label"), pursuant to which we engage your services throughout the Territory for the purpose of making records, and you agree to render such services to us. The parties intend to enter into a more formal agreement with respect to the subject matter hereof at a later date ("Long Form"). However, until such time as a Long Form is completed, this agreement, including, without limitation, all promises and covenants contained in Exhibit A, attached hereto and incorporated herein by this reference, governs the relationship between the parties hereto with respect to the subject matter hereof and is binding.

1.      **Territory**: Worldwide

2.      **Recording Commitment**: You agree to deliver three (3) additional master recordings, each embodying new, original, and previously unreleased recorded studio performances (collectively with the Existing Master, the "Master(s)"), no later than six (6) months from the Effective Date.

Throughout this period and until the final Master required under this Agreement is delivered and accepted by us, you agree to release music exclusively through the Label. For purposes of this Agreement, "Delivery" shall mean the actual receipt (and acceptance/approval) by us and our distributor of fully mixed and edited Master(s) embodying material approved by us that are commercially and technically satisfactory to us (in our sole discretion) for the manufacture and sale of records, together with all applicable mixes, edits, artwork, materials, consents, approvals, clearances, licenses, permissions, side artist, sample and producer agreements, and any other materials reasonably requested by us.

3. a)      **Advance**: We hereby agree to pay you an advance of Twenty Thousand US Dollars ($20,000 USD) (the "Advance"), which shall be fully recoupable against your share of Net Profit as well as the share of Net Profits of any past deals you have with the Label; the Advance shall be paid thirty (30) days upon your delivery to us and our acceptance of the Recording Commitment. The Advance shall be inclusive of all recording costs associated with the Master(s) delivered hereunder, and except as set forth herein, you will be solely responsible for the payment of all recording costs and related costs incurred to deliver each record and other materials hereunder.

We hereby agree to pay you an advance of Twenty Thousand US Dollars ($20.000 USD) (the "Advance"), which shall be fully recoupable against your share of Net Profits. The Advance shall be disbursed as follows:
- **First Payment**:: Ten Thousand US Dollars ($10,000 USD), shall be paid within thirty (30) days of the complete execution of this Agreement and delivery of the first master recording,
- **Second Payment**: Five Thousand US Dollars ($5,000 USD), shall be paid within thirty (30) days of the delivery and acceptance of the second master recording.
- **Third Payment**: The remaining Five Thousand US Dollars ($5,000 USD), shall be paid within thirty (30) days of the delivery and acceptance of the final master recording.
The Advance shall be inclusive of all recording costs associated with the Master(s) delivered hereunder, and except as set forth herein, you will be solely responsible for the payment of all recording costs and related costs incurred to deliver each record and other materials hereunder.

3. b) **Performance Bonus:** We hereby agree to pay you and additional Performance Bonus of Ten Thousand US Dollars ($10.000 USD). Said Performance Bonus shall be payable when all 3 master recordings surpass the set milestone Six Hundred Thousand (600.000) daily streams, cumulatively, and maintain set milestone for at least Ten (10) calendar days on the platform of Spotify. Said Performance Bonus shall not be recoupable against your share of Net Profits.

4.      **Marketing Fund**: We shall provide to you an all-in marketing fund of up to OneThousand US Dollars ($100.000 USD) to be administered by us, which shall be inclusive of all marketing, promotion, and advertising (each a "Marketing Fund") for the Recording Commitment. From the Marketing Fund only Fifty Thousand US Dollars ($50,000 USD) shall be fully recoupable against your share of Net Profits.The recoupable portion of the Marketing Fund can and will be recouped from any past and future tracks released with the Label.

5.      **Royalties**:   We will pay you Fifty Percent (50%) of our Net Profits (as hereinafter defined) in connection with the Master(s)("Royalty"). As used herein, "Net Profits" shall mean the gross fees, royalties and all other consideration actually received by us which are solely, directly and identifiably attributable to the exploitation of the Master(s) and/or Composition(s) ("Gross Income") less the following: (i) the deduction of any distribution expenses (including, without limitation, fees charged by any distributor and/or retail Platform, credit card fees, costs associated with the ingesting of files or correction of any information related thereto), (ii) reasonable reserves for returns, refunds, rebates, credits and exchanges, and (iii) any sales, use, value added or other taxes. For the avoidance of doubt, any other third party costs or expenses incurred and paid by us in connection with the production, marketing, promotion or other exploitation of the Master(s), all records derived therefrom, and the Composition(s) shall be fully recoupable as an advance against your share of Net Profits, including, without limitation: (1) manufacturing costs, (2) any costs incurred and paid by us in connection with the recording of the Master(s) (including, without limitation, mixing/re-mixing/mastering costs, studio fees, costs of creating any remixes, fees paid to third-party producers, remixers, featured performers, or any other third-parties rendering services in connection with the Master(s), etc.), (3) all third party expenses relating to manufacturing, exploiting or otherwise producing the Master(s) (including, without limitation, the

Marketing Fund(s), and any applicable union or guild payments in respect of exploitations of the Master(s)), (4) all costs of collection, copyright registration, any taxes required to be deducted, any collection or other society charges, and any sums paid or owed to third party subpublishers, licensing agents, arrangers, adaptors or translators of the Compositions, and (5) co-op advertising costs or consumer advertising costs. Notwithstanding the foregoing, Net Profits shall expressly exclude (x) the "label share" of SoundExchange and/or neighboring rights income (which we will solely claim and keep for ourselves, but you can claim and keep for yourself the "performer's share" thereof), and (y) any income collected by us via the so-called YouTube Partner Program. For the avoidance of doubt, you share of Net Profits hereunder is inclusive of any and all mechanical royalties payable to you and/or any third parties.

6.    **Rights**: We (and our designee(s)) will have the sole and exclusive right to exploit the Master(s) (and any derivative versions, such as remixes) together with all artwork, all videos, and all other materials related thereto in any manner and all media throughout the Territory during the License Period, including, without limitation, streaming, downloads, sales of physical records, synchronization licenses, compilation licenses, and licensing of performance rights related to the master recording (e.g., neighboring rights) under any mark/indicia designated by us, and the right to sub-license all of the foregoing rights to third parties, but you will still own the Master(s). The only exception is that we (and our designee(s)) can grant perpetual, worldwide synchronization and compilation licenses (including our own compilations). We (and our designee(s)) can also grant the right to use the Master(s) and Composition(s) on a gratis basis via third-party mobile applications (including, without limitation, Twitch, TikTok, and other analogous platforms) for promotional purposes. You give us the right to use your name, likeness, and biography in connection with our exploitation of the Master(s) and/or Composition(s). We will give you an opportunity to approve these materials, but you must respond in five (5) days or you automatically give approval. As used herein, "License Period" shall mean the period commencing on the Effective Date and continuing for the life of copyright (including any and all renewals and extensions thereof). Label shall be entitled to maintain one, uncrossed account with respect to all costs, royalties, or other amounts under this Agreement or under any other agreement between Artist and Label or Label's affiliates.

7.    **Holdback**: The "Holdback Period" begins on the Effective Date and shall end fourteen (14) days after each initial commercial release date of the designated Master(s) hereunder. During the Holdback Period, you will not release (or permit the release) of any previously unexploited recordings featuring Artist other than through Label other than recordings that include Artist's performances as a producer, mixer, background vocalist or session musician.

8.    **Streaming Threshold:** If a Master's audio-only streams on Spotify exceed One Hundred Thousand Fifty Thousand (250,000) per day for seven (7) consecutive days (the "Streaming Threshold"), the Label, at its sole discretion, may provide an additional fund of up to Fifty Thousand Dollars ($50,000) for marketing, promotion, and advertising of the Master(s) (the "Threshold Fund"). From the Threshold Fund only Twenty Five Thousand US Dollars ($25,000 USD) shall be fully recoupable against your share of Net Profits

9.    **Promotional Efforts:** Artist acknowledges the importance of consistent and frequent social media promotion for a successful release campaign. Artist must make a minimum of eight (8) so-called "feed" posts on all social media outlets (e.g., Facebook, Instagram, TikTok, etc.) ("Posts") to promote the announcement and release of each Master on Artist's official Instagram and TikTok account within a time period provided by Label.

10.    **Controlled Compositions**: You hereby grant us and our licensees an irrevocable license to: (i) manufacture, reproduce and distribute each composition embodied on a Master hereunder (each a "Composition" and collectively, the "Compositions") on records throughout the Territory; (ii) print and reproduce the title and/or lyrics of each Composition on record artwork and in audiovisual works; and (iii) reproduce, manufacture, distribute, perform and exploit the Compositions in audiovisual works (including music videos) and in advertisements for the Masters in any and all media now known or hereafter devised, in any manner (including publicly and for profit). In consideration of the foregoing license, we shall pay mechanical royalties on net sales of records in the United States at seventy five percent (75%) of the current minimum statutory rate (without regard to playing time), subject to the following caps: 10x the applicable rate for albums; 5x the applicable rate for EP's and 2x the applicable rate for singles.

11.    **Matching Rights Clause - Release (Custom):** Notwithstanding any other provision in this Agreement, the Matching Right Clause detailed in the exclusive license agreement for "ATLXS - PASSO BEM SOLTO" dated on Jan 24th, 2025 shall be waived and shall cease to have effect upon the completion of the Recording Commitment as defined in the specific section or clause detailing the Recording Commitment. Upon the fulfillment of the Recording Commitment, all recordings released by Artist after the Effective Date of this license and waiver will not be subject to the prior Matching Right Clause. The Label acknowledges and agrees that, following the completion of the Recording Commitment, the Artist is free to negotiate and enter into any Further Agreements regarding such recordings without offering the Label the right of first negotiation or any matching rights as previously stipulated. This waiver is irrevocable and acknowledges the completion of all obligations under the Recording Commitment by the Artist as sufficient condition for its activation.

12.    **Publishing**: You hereby irrevocably transfer, convey, grant and assign to us, our successors and assignees, an undivided fifty percent (50%) of your respective right, title and interest throughout the Territory, including, without limitation, the copyright, the right to secure copyright registration and any and all rights of renewals and extensions of copyright, in and to all Composition(s), including the title, lyrics and music thereto, and grant to us the exclusive rights to administer one hundred percent (100%) of the copyrights in and to the Composition(s). We shall retain all rights acquired by it under this agreement in the Territory for the maximum life of the copyright and any and all renewals and extensions thereof.

13.    **Accounting**: Monthly- within ninety (90) days after each monthly accounting period (i.e., within 90 days of June 30 and December 31) (the "Accounting Period(s)"). You can audit us (at your sole expense, on reasonable advance notice, no more than once per calendar year or statement, and during our regular business hours), to ensure you are being paid properly, but if you do not dispute a particular statement within two (2) years after we render it you, then you agree that it is binding and you

cannot object to it. You cannot sue us regarding any statement unless you do so within three (3) years after the date it is rendered.

14.    **Samples**: You acknowledge and agree that you are solely responsible for accounting any amounts due in connection with any samples embodied in the Master(s) or Composition(s) (each, a "Sample") directly to the applicable third-party sample owner (each, a "Sample Owner") (including, without limitation, any portion of your share of Net Profits), and that you shall be solely responsible for all costs associated with clearing such sampled or interpolated third party material ("Clearance Costs'). Notwithstanding the foregoing, and solely as an accommodation to you, we shall have the right, but not the obligation, at our sole election, to pay the Clearance Costs for any Samples to the applicable Sample Owner, which Clearance Costs shall be deemed fully recoupable as advances against your share of Net Profits. If we elect to make any such payments to the Sample Owners (or any other third-party), such payments shall be made solely as an accommodation to you and are deemed to be payment to you. In no event will any Sample Owner be deemed a third party beneficiary under this Agreement or enjoy any rights against us.


*SIGNATURE PAGE FOLLOWS*


**AGREED AND ACCEPTED:**                          **AGREED AND ACCEPTED:**

Label / "Us"                                      Artist / "You"

*Branden De Oliveira*                             *Diego Basile*

box SIGN        4YXL7351-1VJ52V77                 box SIGN        13JR6X6Q-1VJ52V77

Its Authorized Signatory                          Its Authorized Signatory

**Schedule**

| TITLE | MASTER OWNERSHIP | COMPOSITION OWNERSHIP | CREDITS |
|---|---|---|---|
| [TRACK TITLE] 1 | [ARTIST – 100%] | [ARTIST – 100%] | [ARTIST – 100%] |
| [TRACK TITLE] 2 | [ARTIST – 100%] | [ARTIST – 100%] | [ARTIST – 100%] |
| [TRACK TITLE] 3 | [ARTIST – 100%] | [ARTIST – 100%] | [ARTIST – 100%] |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**EXHIBIT A**
**Terms and Conditions**

1. **Independent Contractor.** This Agreement shall not render Label an employee, partner, or joint venturer with Artist for any purpose. Label is and will remain an independent contractor in his or her relationship to Artist.

2. **Obligations, Representations and Warranties.** Each party represents and warrants that it: (i) is an entity duly formed and/or organized and validly subsisting pursuant to the laws of its jurisdiction of formation and/or organization; (ii) that this Agreement has been executed by a duly authorized representative; and (iii) that it has the right, power and authority to enter into this Agreement and to fully perform its respective obligations hereunder. Artist further represents and warrants that (i) no selections, materials, ideas, or other properties furnished by Artist or anyone engaged or furnished by Artist and embodied or contained in or used in connection with the Master(s) and/or Composition(s) will violate or infringe upon any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights, rights of privacy, proprietary or intellectual property rights, trademark rights, and rights of publicity or violate any applicable laws (including without limitation the laws and regulations governing export control, unfair competition, anti-discrimination or false advertising); (ii) all of Artist's representations and warranties contained in this Agreement shall be true and correct upon execution hereof and shall remain in effect for so long as Label, its licensees, assignees, transferees or successors in interest remain subject to this Agreement; (iii) any statements Artist makes regarding Label's products or services reflect Artist's true and honest opinion of, and experience with, Label's products and services. It is understood and agreed that Artist shall not, and shall not be required to, narrate or deliver any copy or statement that Artist believes is factually inaccurate; and (iv) Artist owns or controls, and shall own and control, the rights necessary to make the grants of rights, licenses and permissions hereunder and necessary for Label to effect the purpose of this Agreement, without the need for any licenses, releases, consents, approvals not granted herein or the requirement to make any payments of any nature to any person. Artist hereby agrees: (i) Artist shall be solely responsible for obtaining all necessary licenses, releases and permissions for any individuals, production, third party content, etc. and for making all payments in connection therewith and (ii) Artist will not re-record a master embodying a Composition during the License Period. In the event Artist consists of more than one individual and/or signatory the terms of this agreement (including the warranties and representations herein) shall be joint and several.

3. **Indemnification.** The Artist (for these purposes, "**Indemnitor**") shall indemnify, defend and hold the Label ("**Indemnitee**") harmless against and in respect of any claims, losses, damages or expenses (including, without limitation, reasonable attorneys' fees and litigation costs), that Indemnitee may incur, which arise from or relate to any alleged breach of, or failure by Indemnitor to perform, any of Indemnitor's representations, warranties, or promises in this Agreement or in any schedule, certificate, exhibit, or other instrument furnished or to be furnished by Indemnitor under or in connection with this Agreement, except where such claims, losses, damages or expenses arise from the negligence or willful misconduct of the Label. It is understood that Indemnitor's obligation to indemnify and defend pursuant to this paragraph shall subsist regardless of whether Indemnitor defeats the claim or the claim results in an adverse judgment or settlement. Indemnitee shall notify Indemnitor of any claim presented to Indemnitee by a third party. Indemnitor shall defend any third-party claim, at its sole expense, with counsel approved by Indemnitee. However, if Indemnitee determines in its sole discretion that it is necessary for its own protection to take over the defense of any such claim, Indemnitee may do so at Indemnitor's sole expense and without any requirement to consult with Indemnitor about choice of counsel or the conduct of the proceeding. No such claim asserted by a third party may be settled by Indemnitee without Indemnitor's prior written consent (such consent not to be unreasonably withheld or delayed), so long as Indemnitee is actively defending such claim in a manner consistent with industry norms, unless Indemnitee shall agree not to seek indemnity from Indemnitor for any settlement payment made by Indemnitee to the claimant and further subject to the following. If Indemnitor does not approve a settlement proposed by Indemnitee, Indemnitee may nonetheless settle the matter unless, within ten (10) business days after notice to Indemnitor, Indemnitor furnishes to Indemnitee a surety bond or letter of credit from a national surety company or bank, in form and content satisfactory to Indemnitee, insuring Indemnitee against the amount of the claim in addition to reasonable attorney's fees and litigation costs expended in connection with the claim and a reasonable estimate of such fees and costs required to continue the defense. If any claim shall be lodged with Label or any action commenced having as its basis a claim which, if proved, would constitute a breach by Artist of any of Artist's representations, warranties, or covenants contained herein, Label, in addition to any other right or remedy otherwise available, shall have the right to control the defense thereof and settle same (subject to the above) and, additionally, may withhold from any payments otherwise due to Artist hereunder an amount equivalent to that claimed or sued for plus reasonable costs and attorney's fees relating thereto. Any amount so withheld shall be credited to Artist's account when Artist shall have received reasonable assurances that the claim or action has been finally settled or fully adjudicated and the judgment satisfied, or that the statute of limitations on such claim has run, or when reasonable and adequate security for the claim has been provided to Label.

4. **Limitation of Liability.** To the maximum extent permitted by applicable law, in no event will Label be liable to Artist for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct loss), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage or expense of any kind arising out of or in any way related to the Master(s), Composition(s), or this Agreement, even if foreseeable or even if Label has been advised or should have known of the possibility of such damages. Label assumes no responsibility for the downtime of Label's computers, Artist's network, or for the loss of information, data records, or the Master(s)/Composition(s) due to circumstances beyond Label's reasonable control, including but not limited to natural disasters, power outages, or third-party actions. In no event will Label's total liability to Artist for all damages, losses or causes of action exceed the total amount paid to Artist under this Agreement.

5. **Notices.** All notices hereunder shall be in writing and shall be sent by registered mail or certified mail, return receipt requested, postage prepaid and with receipt acknowledged, or by hand (to an officer if the party to be served is a corporation), or by telegraph, facsimile or e-mail, all charges prepaid, at the respective addresses set forth above, or such other address or addresses as may, from time to time, be designated in writing by either party; provided, that payments may be made by means of regular mail. The date of making of personal service or of mailing or of deposit in a telegraph office or transmission via facsimile, or transmission via e-mail, whichever shall be first, shall be deemed the date of service, except that notice of change of address shall be effective only from the date of its receipt. If either party feels the other is in breach of this Agreement, each party has to give the other party written notice via personal delivery, certified or registered mail, or FedEx. Except in the case of a material breach by the Artist, the other party has thirty (30) days to cure any breach. In the event of a material breach by either party, the non-breaching party may terminate this Agreement immediately upon written notice to the breaching party.

6. **Confidentiality.** Artist shall hold in strict confidence all Proprietary Information (defined below) and take the same precautions as Artist employs to safeguard its own confidential information, but in no event shall Artist exercise less than a reasonable degree of care. Artist shall not use, disclose or reveal any Proprietary Information (or any information derived therefrom) to any person or entity, except on a "need to know" basis or for any purpose, except for Artist's use as necessary in the ordinary course of performing the Services. For purposes of this Agreement, "**Proprietary Information**" means all information, knowledge and data that relates to the actual or anticipated business, research, development, products, services and/or finances of Label, its affiliates or subsidiaries disclosed by, or obtained from, Label, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or visually, including, without limitation, algorithms, trade secrets, computer software, source code, data structures, databases, scripts, application programming interfaces, protocols, drawings, designs, mask works, formulas, technology, ideas, know-how, products, features and modes of operation, services, customer lists and customers, supplier lists and suppliers, compilations containing customer or supplier information, contacts at or knowledge of clients or prospective clients, finances, processes, schematics, specifications, techniques, inventions and improvements (whether or not patentable), patent applications, developments, discoveries, works of authorship, derivative works, technical, business, financial, marketing, customer and product related plans, analyses, compilations, studies, forecasts and strategies and confidential information received by Label from third parties and all information that is developed, created or discovered by Artist, either individually or in collaboration with others, in performing the Services.

7. **Entire Agreement and Severability.** This Agreement sets forth the entire agreement and understanding between Artist and Label relating to the subject matter herein and supersedes all prior discussions between Artist and Label. Any subsequent change or changes in Label's services will not affect the validity or scope of this Agreement. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

8. **Governing Law and Consent to Personal Jurisdiction.** This Agreement shall be governed by the laws of the State of California, without regard to California's conflicts of law rules. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the Commercial Rules of the American Arbitration Association (AAA) by a single arbitrator using expedited procedures and located in Los Angeles, California. The parties shall mutually agree upon the arbitrator and if the parties cannot agree then one shall be appointed according the AAA rules. Judgment upon the award rendered by the arbitrator may be entered into in any court of competent jurisdiction and shall not be appealable. Furthermore, the prevailing party shall be entitled to reasonable attorneys' fees. This clause shall not preclude any party pursuing injunctive or equitable relief in any court of competent jurisdiction.

9. **Legal Representation.** Artist acknowledges and agrees that Artist has read this Agreement and that the Label has advised Artist of the importance of seeking independent legal advice. Artist acknowledges and agrees that Artist has had the unrestricted opportunity to be represented by an independent attorney. In the event of Artist's failure to obtain an independent attorney or waiver thereof, Artist hereby warrants, represents and agrees that Artist will not attempt to use such failure and/or waiver as a basis to avoid any obligations under this Agreement, or to invalidate this Agreement or to render this Agreement or any part thereof unenforceable.

10. **Assignment.** This Agreement will be binding upon and inure to the benefit of the parties and their permitted successors and assigns. Label may assign this Agreement or any of its rights or delegate any of its obligations hereunder without the prior written consent of you or Artist to any person or entity, and in each case, such rights or delegation of duties may be further assigned or delegated to any assignee by any such person that acquires such rights or duties hereunder. Neither your nor Artist may assign this Agreement or any of your rights hereunder and any such purported assignment shall be void *ab initio*.

11. **Modification.** This Agreement may not be modified except by amendment reduced to writing and signed by both Artist and Label. No waiver of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach thereof.

12. **Headings.** Section headings are not to be considered a part of this Agreement and are not intended to be a full and accurate description of the contents hereof.

13. **Further Document.**  If any other provisions or agreements are necessary to enforce the intent of this Agreement, each of Artist and Label agree to execute such provisions or agreements upon request.

14. **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.  Electronic signatures and signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.